James J. LAUGHLIN, Appellant,

v.

UNITED STATES of America, Appellee.

Alan U. FORTE, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 18711, 18712.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 16, 1964.

Decided Feb. 11, 1965.

Mr. William J. Garber, Washington, D. C., for appellant James J. Laughlin.

Mr. James J. Laughlin, Washington, D. C., for appellant Alan U. Forte.

Mr. David C. Acheson, U. S. Atty., with whom Messrs. Frank Q. Nebeker, Joseph A. Lowther and Anthony A. Lapham, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Senior Circuit Judge, and DANAHER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The appellants in this case were convicted of a conspiracy to commit an offense against the United States [1] by influencing the actions of one Jean Smith, a material witness in an earlier criminal prosecution against appellant Forte.[2] Each appellant here was also convicted of the substantive offense of

The trial ended in a verdict of acquittal on February 20, 1963. Appellant Laughlin was Dr. Forte's defense counsel in the abortion case.

corruptly endeavoring to influence Mrs. Smith in her actions as a witness.[3]

The case for the prosecution rested chiefly on the testimony of Bernice Gross, who was named as a third member of the alleged conspiracy but was not indicted. It appears that she had acted as an intermediary between the appellants and the target witness, Mrs. Smith. Mrs. Gross testified to numerous conversations with each appellant concerning her role in the scheme, and also stated that on one occasion appellant Laughlin had instructed her to have Mrs. Smith write a letter to the United States Attorney asking him to excuse her from appearing in the criminal case against Forte. Such a letter was actually sent and was introduced by the Government as evidence in this case. Mrs. Gross further testified that on several occasions she had received sums of money from appellant Forte which she delivered to Mrs. Smith.

The testimony of Mrs. Gross was corroborated by Mrs. Smith, who acknowledged receiving gifts of money from Mrs. Gross and writing the letter to the United States Attorney at the suggestion of Mrs. Gross. Mrs. Gross' story was also corroborated by tape recordings, offered by the Government, of four telephone conversations between Mrs. Gross and appellant Laughlin which occurred some time after the alleged conspiracy had ended.[4] Of the numerous points raised on appeal, the primary contention of the appellants is that these recordings should not have been admitted as evidence in this case.

## I.

The same tape recordings introduced in this case were also involved in a prior case, Criminal No. 599–63, in which appellant Laughlin was tried on a charge of perjury. In that case, the Government introduced the recordings in evidence, but subsequently, on Laughlin's motion, the court declared a mistrial, holding that they should have been excluded. The court found that the recordings had been made in violation of Section 605 of the Communications Act[5] since they were made without the consent of Mrs. Gross.[6] The indictment in Criminal No. 599–63 was thereafter dismissed on the ground that, excluding the recordings, the evidence before the grand jury was not sufficient to sustain the indictment.[7]

In the trial of this case, Laughlin contended that under the doctrine of collateral estoppel the Government should have been precluded from relitigating the question of whether Mrs. Gross' consent to the making of the recordings was coerced. The trial court rejected this contention, found that Mrs. Gross' consent was freely given, and admitted the recordings into evidence. We hold that in so doing the court erred.

## II.

The doctrine of collateral estoppel, developed largely in the context of civil litigation, is designed to prevent repetitious litigation of the same issue by the same parties.[8] It applies generally to preclude relitigation of an issue resolved by final judgment in a prior legal action.[9] While some of the policies underlying the application of the doctrine may be different,[10] it is well es-

3. 18 U.S.C. § 1503.

4. The circumstances of these conversations are fully set out in United States v. Laughlin, D.D.C., 222 F.Supp. 264 (1963).

5. 48 STAT. 1103, 47 U.S.C. § 605.

6. United States v. Laughlin, *supra* Note 4.

7. United States v. Laughlin, D.D.C., 223 F.Supp. 623 (1963).

8. See generally, Polasky, Collateral Estoppel—Effects of Prior Litigation, 39 IOWA L.REV. 217 (1954); Note, 52 COLUM. L.REV. 647 (1952).

9. United States v. Kramer, 2 Cir., 289 F.2d 909, 913 (1961); RESTATEMENT, JUDGMENTS § 68 (1942).

10. Collateral estoppel in criminal cases is influenced by the policy forbidding repeated criminal prosecutions by "the State with all its resources and power,"

tablished that the principles of collateral estoppel apply in criminal, as well as in civil, litigation.[11] This much is not controverted.

The contention of the Government is that, in the particular circumstances of this case, the doctrine should not apply. Conceding that the issue of admitting the recordings was litigated on Laughlin's motion for mistrial in Criminal No. 599–63, the Government points out that Judge Youngdahl's order granting that motion was not a final judgment. Admitting that Judge Curran's dismissal of the indictment in Criminal No. 599–63 was a final judgment, the Government contends that the issue as to the admissibility of the tapes was not litigated during the hearing on the motion to dismiss.[12] By thus separating the two prerequisites for collateral estoppel —full litigation and final determination —the Government seeks to show that the issue of whether Mrs. Gross voluntarily consented to the recordings was open for resolution in the present case.

We see no reason why this separation should have the effect sought. When the question of Mrs. Gross' consent was litigated before Judge Youngdahl on the motion for mistrial, both the Government and appellant had full opportunity to present, and presumably did present, whatever relevant evidence they had. Judge Youngdahl ruled against the Government.[13] Although the Government did not challenge the ruling, the fact of coercion, as found by Judge Youngdahl, was essential to Judge Curran's disposition of the motion to dismiss the indictment. He had the transcript of the record made before Judge Youngdahl before him. He had Judge Youngdahl's opinion before him, and since he agreed that the tape recordings were illegally made, he dismissed the indictment for lack of competent evidence.[14]

which underlies the constitutional protection against double jeopardy. See Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); United States v. Kramer, *supra* Note 9, 289 F.2d at 916; Bizzell v. State, Fla., 71 So.2d 735 (1954). See generally, Lugar, *Criminal Law, Double Jeopardy and Res Judicata*, 39 IOWA L.REV. 317 (1954); *Comment*, 28 U.CHI.L.REV. 142, 150 (1960); Note, 77 HARV.L.REV. 1272 (1964); *Note*, 65 YALE L.J. 339, 339–351 (1956).

11. Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948); United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916); Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915); Coffey v. United States, 116 U.S. 436, 6 S.Ct. 437, 29 L.Ed. 684 (1886); Travers v. United States, 118 U.S.App.D.C. 276, 335 F.2d 698, 703 (1964); United States v. DeAngelo, 3 Cir., 138 F.2d 466 (1943). In United States v. Carlisi, E.D.N.Y., 32 F.Supp. 479 (1940), the District Court for the Eastern District of New York held the doctrine of collateral estoppel to apply to a situation very similar to that presented by this case.

We need not, of course, consider on this appeal whether the doctrine of collateral estoppel can be invoked by the Government against an accused. Suffice it to say now that such a case would quite obviously present different problems. See Jackson v. Denno, 378 U.S. 368, 410, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (dissenting opinion of Mr. Justice Black) (problems of "piece-meal prosecution"), and Steele v. United States, 267 U.S. 505, 45 S.Ct. 417, 69 L.Ed. 761 (1925), and *compare* United States v. DeAngelo, *supra, and* United States v. Carlisi, *supra, with* United States v. Rangel-Perez, S.D.Cal., 179 F.Supp. 619 (1959).

12. In its "Opposition to Defendants' Motions to Dismiss the Indictments" in Criminal No. 599–63, the Government assumed "*arguendo* for purposes of this opposition that this Court has already ruled that certain evidence before the Grand Jury was tainted and unlawful."

13. United States v. Laughlin, *supra*, Note 4.

14. In his memorandum opinion, Judge Curran wrote:

"After Judge Youngdahl read the transcript of the exchange between Mr. Sullivan, Mrs. Gross and the Deputy Foreman of the Grand Jury, and had questioned Mrs. Gross as to the circumstances under which she made the telephone calls, he concluded that * * * [the tapes must be excluded] on the ground

Here, after a determination that Mrs. Gross' consent was not voluntary, the proceedings in Criminal No. 599–63 had been terminated. The Government then had the right to appeal. On this appeal the findings of the trial court would have been subject to review. Hence, this was not a situation where the Government was to be bound by an order not subject to review.[15]

One final matter requires discussion. Relying on the distinction drawn by the court's opinion in The Evergreens v. Nunan,[16] the Government contends that the fact in issue here was not an ultimate fact. In Yates v. United States, 354 U.S. 298, 338, 77 S.Ct. 1064, 1087, 1 L.Ed.2d 1356 (1957), the Supreme Court said that "[t]he normal rule is that a prior judgment need be given no conclusive effect at all unless it establishes one of the ultimate facts in issue in the subsequent proceeding. So far as merely evidentiary or 'mediate' facts are concerned, the doctrine of collateral estoppel is inoperative. [Citing *Evergreens.*]" Thus the Government contends that the doctrine is inoperative in this case.

Whether or not the *Evergreens* distinction applies generally to criminal cases,[17] its application to this case does not prevent the operation of collateral estoppel. "Ultimate facts" are defined in *Evergreens* as "those which the law makes the occasion for imposing its sanctions." 141 F.2d at 928. The coercion of Mrs. Gross is such a fact. Because her consent was coerced, the listening in to the telephone conversation was an "interception" in violation of the Communications Act.[18] On that account, the intercepted conversations cannot be used as evidence.[19] Moreover, the evil which the court in *Evergreens* sought to avoid will not result from estopping the Government from disputing the fact of coercion in this proceeding. In *Evergreens* the court, by limiting collateral estoppel to facts which are ultimate in the subsequent proceeding, sought to pre-

that Mrs. Gross' consent was not voluntary. I agree."
United States v. Laughlin, *supra* note 7, 223 F.Supp. at 625.

15. Since the Government had the right to appeal, 18 U.S.C. § 3731, it was duty bound to proceed accordingly or become subject to the doctrine of collateral estoppel. In fact, the Government did note an appeal, but it was later dismissed on the Government's own motion.

16. 2 Cir., 141 F.2d 927, 928, 152 A.L.R. 1187, *cert. denied*, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944):
"* * * [A] 'fact' may be of two kinds. It may be one of those facts, upon whose combined occurrence the law raises the duty, or the right, in question; or it may be a fact, from whose existence may be rationally inferred the existence of one of the facts upon whose combined occurrence the law raises the duty, or the right. The first kind of fact we shall for convenience call an 'ultimate' fact; the second, a 'mediate datum.' * * *"

17. Recently, the Second Circuit had occasion to comment on this point. In United States v. Kramer, *supra* Note 9, 289 F.2d at 917, the court stated:
"Whatever the force of The Evergreens v. Nunan and its repetition in the Restatement may be in civil cases, the statement ought not be literally applied to criminal judgments. Professor Scott, one of the co-reporters of the Restatement, has wisely remarked that the application of *res judicata* in criminal cases presents 'questions of policy quite different from those applicable to civil proceedings,' 39 Iowa L.Rev. 214, 216. * * * *"

18. 47 U.S.C. § 605 provides in pertinent part:
"* * * [N]o person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *."
In Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), the Supreme Court held that no "interception" occurred where a telephone conversation was overheard by means of an extension telephone so long as one of the parties to the conversation had consented to the overhearing. But when the consent is not voluntary, the *Rathbun* doctrine does not apply.

19. Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957); Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937).

vent the use of prior determinations to support inferences which were totally unforeseeable at the time of the prior litigation.[20] In this case, no inference from the fact of Mrs. Gross' involuntary consent is drawn which was not foreseeable earlier. Indeed, the only "inference," if it may be called that, which is drawn in this case is the same drawn in the prior case, that is, that the telephone conversations were intercepted in violation of the law. Moreover, since both this indictment and the one in No. 599–63 were returned by the same grand jury,[21] the Government cannot in good faith claim, nor does it claim, surprise that the same issue should arise in the two cases.

The plain fact is that the Government, after fully, but unsuccessfully, litigating the admissibility of the tapes, sought to litigate it again. After two trial judges had held the tapes inadmissible, the Government asked a third

to admit them. After Judge Curran rendered final judgment in the District Court, the Government should have pursued its appeal or acquiesced in the judgment.

### III.

Since we hold the recordings inadmissible, we must now consider whether their admission requires reversal as to both appellants. The jury was carefully instructed that the recordings were only to be considered evidence against appellant Laughlin, and that, even as to him, they could only go to show his participation in the conspiracy, not his guilt on the substantive charge. But the natural effect of the recordings was to compensate for the questionable credibility of Mrs. Gross.[22] In the recorded conversations, the parties apparently assume the occurrence of the transactions which Mrs. Gross had related.[23] After

20. The Evergreens v. Nunan, *supra* Note 16, 141 F.2d at 929. See Hyman v. Regenstein, 5 Cir., 258 F.2d 502, 510–511 (1958), *cert. denied*, 359 U.S. 913, 79 S. Ct. 589, 3 L.Ed.2d 575 (1959); see also Note, 52 COLUM.L.REV. 647, 663 (1952), and *Comment*, 65 HARV.L.REV. 818, 842 (1952).

Yates v. United States, *supra*, 354 U.S. at 336, 77 S.Ct. at 1086, is a good example. In a denaturalization proceeding held in 1927 it had been established that petitioner Schneiderman had not "prior to 1927, adopted an interpretation of the Communist Party's teachings featuring 'agitation and exhortation calling for present violent action.'" On trial for Smith Act violations in 1951, Schneiderman sought to have the jury instructed to give the prior determination such partial conclusive effect as it might warrant. The trial court refused the instruction and the Supreme Court affirmed, holding "in this case the matters of fact and mixed fact and law necessarily determined by the prior judgment * * * were so remote from the issues as to justify their exclusion from evidence in the discretion of the trial judge." 354 U.S. at 338, 77 S.Ct. at 1087.

Obviously, it was unforeseeable in 1927 that determinations made in the denaturalization proceeding might be used in a criminal proceeding 25 years later, not

to establish a fact primarily at issue in the criminal case, but to support an inference with regard to events happening immediately prior to the prosecution.

21. See United States v. Laughlin, *supra* Note 7.

22. The credibility of Mrs. Gross was impeached by her own admissions that she had perjured herself, in connection with the same matters to which she was testifying at trial, during two appearances before the grand jury. Furthermore, as a party to the conspiracy, a jury might conclude that her interest in cooperating with the Government to avoid charges against herself was obvious.

23. For instance, at one point in the conversation the parties to it were discussing Mrs. Gross' appearance earlier that day before the grand jury where she had been questioned on the alleged conspiracy with Laughlin and Forte. Part of the conversation went as follows:

"LAUGHLIN: Well, well, what did they ask you?
"GROSS: Everything, I think they're on to us. I think they're on to me, and I'm telling you I'm quite upset.
"LAUGHLIN: Well, I mean, what did they ask you?
"GROSS: They asked me everything.
"LAUGHLIN: Well, when you say everything, what do you mean?

hearing the recordings, the jury would certainly tend to give more credence to Mrs. Gross' entire testimony than if they had not heard them. Since the conviction of appellants on each count depended heavily on the testimony of Mrs. Gross, we cannot say that there was not "a reasonable possibility that the evidence complained of might have contributed to the conviction." [24] The court's limiting instruction does not cure the prejudicial effect of evidence which is competent against neither Forte nor Laughlin.[25] We therefore hold that the convictions of both appellants on each count of the indictment should be reversed.

"GROSS: Oh, about whether I took any money or different things like that. It was terrible. I'm—I'm still here.
"LAUGHLIN: You're what?
"GROSS: I'm still in Washington.
"LAUGHLIN: Well, why are you still there?
"GROSS: I just got out. I'm ready to go on home now.
"LAUGHLIN: Well—
"GROSS: And I am not going to answer the phone. They may tap my wire. I don't know. And you know, the old man is supposed to call me this evening. I'm not answering the phone. .
"LAUGHLIN: Well, who—who else was over here?
"GROSS: The two girls from Baltimore.
"LAUGHLIN: Well, they didn't know anything about it, did they?
"GROSS: No, not as far as I know.
"LAUGHLIN: Uh-hunh.
"GROSS: And they also had Jean Smith.
"LAUGHLIN: Oh, they had her there too?
"GROSS: She was in there a hellava long time.
"LAUGHLIN: Was she there—I mean—course she wasn't in there the time you were in there.
"GROSS: No, no.
"LAUGHLIN: Uh-hunh, well, you didn't admit anything, did you?"
And at another point:

## IV.

On the day the case was set for trial, appellant Laughlin filed an affidavit of bias and prejudice against the District Judge [26] assigned to hear the case. Since the affidavit was filed after the same judge had presided, without objection, for two days over hearings on pre-trial motions, it was correctly regarded as untimely. In re United Shoe Machinery Corporation, 1 Cir., 276 F.2d 77 (1960); Laughlin v. United States, 80 U.S.App.D.C. 101, 151 F.2d 281, *cert. denied,* 326 U.S. 777, 66 S.Ct. 265, 90 L.Ed. 470 (1945). If on remand, however, the case should be assigned to the same District Judge, the

"LAUGHLIN: Well, I don't think you're—I don't see that you—I don't think that you need any lawyer and—er—after all, of course you did pick a beauty in that Mrs. Smith. You said she was a hundred carat, a hundred—she was solid gold.
"GROSS: Well—
"LAUGHLIN: Ha ha, but, however, of course I saw the woman. I mean the woman is just, well, she's just a tramp, anybody that would—you know, that would take help and then bite the hand that feeds them, and so on; well, she's just absolutely worthless. But, so, if you need somebody, let me know. It may be—and as far as you are concerned, you told them you don't even know me, didn't you?
"GROSS: No, I told them I didn't know, I never had any contact with you.
"LAUGHLIN: That's right, that's right. * * *"

24. Fahy v. State of Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

25. See our discussion in Greenwell v. United States, 119 U.S.App.D.C. ——, —— – ——, 336 F.2d 962, 968–969 (1964).

26. The affidavit alleged, *inter alia,* that Laughlin had testified against the District Judge before the Senate Judiciary Committee considering his nomination.

affidavit should be considered. If it is found to be legally sufficient, the District Judge should, in accordance with 28 U.S.C. § 144, "proceed no further" herein. See Green v. Murphy, 3 Cir., 259 F.2d 591, 593, *cf.* dissent at 596 (1958).[27]

Reversed and remanded.