James J. LAUGHLIN, Appellant,

v.

UNITED STATES of America,
Appellee.

Allan U. FORTE, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 19562, 19563.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 15, 1966.

Decided July 28, 1967.

Petition for Rehearing En Banc Denied
Dec. 26, 1967.

---

---

Mr. James J. Laughlin, Washington, D. C., pro se.

Mr. William J. Garber, Washington, D. C., for appellant Forte.

Mr. James A. Strazzella, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before MILLER, Senior Circuit Judge, LEVENTHAL, Circuit Judge, and COFFIN*, Circuit Judge of the United States Court of Appeals for the First Circuit.

COFFIN, Circuit Judge:

The appellants, Laughlin and Forte, challenge on numerous grounds their conviction for conspiracy to obstruct justice and endeavoring to influence a witness. To understand clearly all the points raised, it is necessary to review the complex history of this and related cases from September 11, 1961, when Forte was indicted in the District of Columbia for abortion, alleged to have been committed on Mrs. Jean Smith, of Baltimore, Maryland. Laughlin was Forte's counsel at the trial, which began on February 12, 1963. Two other characters who will assume importance in this narrative are Detective Sergeant Samuel Wallace of the Washington police, who arrested Forte on the abortion charge, and Mrs. Bernice Gross, who investigated the charge while a member of the Baltimore police. The prosecution's principal witness at trial was Mrs. Smith. In defense, Forte testified that the charge was a fabrication, part of a "shakedown" scheme, engineered by Sgt. Wallace. The trial ended on February 20 in a verdict of acquittal, but Forte's accusation triggered a grand jury investigation into "all the evidence of any obstruction of justice" in the case.

Before the grand jury, the evidence soon drifted away from the accusation directed at Sgt. Wallace. Mrs. Gross, testifying first, disclaimed any knowledge of a shakedown involving Wallace, and repeatedly denied speaking to Forte concerning his accusation or receiving payment from either Wallace or Forte or anyone acting for them in return for services performed in the Smith abortion case. Then Mrs. Smith testified that Mrs. Gross had sought to persuade her not to testify in the abortion case; that, at Mrs. Gross's instruction, she had written to the United States Attorney asking to be excused as a witness; and that after writing the letter she had received several "presents" of money and baby clothes from Mrs. Gross.

Thereafter Mrs. Gross was taken to the office of Assistant United States Attorney Joseph M. Hannon, told of the facts that the government had learned from Mrs. Smith, and warned that she might be prosecuted for perjury unless she told "the truth about what happen-

---

* Sitting by designation pursuant to Section 291(a) Title 28 U.S.Code.

ed." The Assistant United States Attorney in charge of the grand jury proceeding, Harold J. Sullivan, promised that he would ask the grand jury to be lenient in considering Mrs. Gross's part in dealing with Mrs. Smith, if it appeared that Mrs. Gross would be a witness against Laughlin and Forte. During approximately two hours of questioning, she admitted the truth of Mrs. Smith's story and stated in detail that she had acted at the direction of Forte and Laughlin. Then she returned to the grand jury proceedings and affirmed the statement she had given during the interrogation. At the close of her testimony, Mr. Sullivan asked if she would make telephone calls to Forte and Laughlin and allow the government to record the conversations. She demurred at first, then acquiesced when the deputy foreman suggested that, although the jury would prefer to "get the ones responsible for the overall operation", "if they make it impossible for us to get the big ones we'll get the little ones." The calls were made and recorded. Later, after Laughlin testified before the grand jury that he had never met or spoken to Mrs. Gross, the government played for that jury a recording of at least one conversation between Mrs. Gross and Laughlin in which Laughlin's comments appeared to assume prior acquaintance with Mrs. Gross and familiarity with the dealings with Mrs. Smith.

In July 1963 the grand jury issued two indictments that are relevant here. One charged Laughlin with perjury in his testimony before the grand jury. The other, which gave rise to the present case, was in four counts. The first charged Laughlin and Forte together with conspiring to obstruct justice and commit offenses against the United States by, *inter alia,* influencing a material witness (Mrs. Smith) in the abortion trial. 18 U.S.C. § 371. Count two charged Forte individually and count four charged Laughlin individually with

attempting to influence Mrs. Smith. 18 U.S.C. § 1503. And count three, which was later dismissed, charged Forte with endeavoring to influence another witness (Mrs. Dorothy Birge).

The perjury trial began first, on October 1, 1963. The government offered as evidence recordings of the Gross-Laughlin telephone conversations. The trial court at first found that Mrs. Gross had consented to the recordings and admitted them into evidence; then, after reviewing the transcript of the colloquy at the close of Mrs. Gross's grand jury testimony, ruled the recordings inadmissible on the ground that Mrs. Gross's consent was coerced. A mistrial was declared. United States v. Laughlin, 222 F.Supp. 264 (D.D.C.1963). Laughlin filed a motion to dismiss the indictment, which was granted on the ground that without the excluded recordings the prosecution rested solely on the uncorroborated testimony of Mrs. Gross. United States v. Laughlin, 223 F.Supp. 623 (D.D.C.1963).[1] The government moved to reconsider and vacate the order of dismissal, arguing that Mrs. Gross's testimony was corroborated by telephone company records of calls between her number and Laughlin's. The motion was denied, United States v. Laughlin, 226 F.Supp. 112 (D.D.C. 1964), for reasons that will be discussed below. The government noted an appeal, then voluntarily dismissed it, and the perjury case terminated.

Trial began on the conspiracy indictment on April 16, 1964, resulting in judgments of conviction. Among the government's evidence were the telephone recordings that had been ruled inadmissible at the perjury trial. We reversed the conviction of both defendants and remanded for a new trial, holding that the judgment in the perjury case precluded relitigation of the admissibility of the recordings. Laughlin v. United States, 120 U.S.App.D.C. 93, 344 F.2d 187 (1965).

1. At the same time the District Court denied a motion to dismiss the pending conspiracy indictment. 223 F.Supp. at 626.

The new trial began on June 2, 1965. The government's case consisted basically of the testimony of Mrs. Smith and Mrs. Gross, which was generally consistent with their testimony before the grand jury. Mrs. Gross also testified to a considerable number of telephone conversations with either Forte or Laughlin in which the details and the progress of the conspiracy were discussed. On this point her testimony was corroborated by telephone company records, many of them the same records involved in the motion to reconsider dismissal of the perjury indictment, *supra.*

In defense, Forte testified that Mrs. Gross had instigated their meetings, offering to help him in the Smith case; that, upon his response that he wasn't worried about the Smith case because he was innocent but was disturbed by Sgt. Wallace's shakedown attempts, she offered to "take care of that"; and that he paid her for attempting to take care of Wallace. He denied any part in attempting to influence Mrs. Smith. Laughlin offered no testimony. The jury returned a verdict of guilty on all three counts.

Both defendants now appeal, raising points that appear to make all the above facts and proceedings relevant to some degree. Upon consideration of all the points raised, we find no error in this latest trial. Of some seventeen separately entitled points in appellants' argument, we have selected only those which, in our view, merit considered discussion here.

■■ Appellants argue that the indictment should have been dismissed because of a variety of defects in the grand jury proceedings. Most substantial of these is the claim that the recordings of the Gross-Laughlin telephone conversations, now established to have been illegally obtained, were played for the grand jury and thus contributed to and tainted the indictment. As to this,

the Supreme Court has repeatedly held that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial on the merits." Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). It might, we suppose, be argued that *Costello* involved only the use of hearsay evidence before the grand jury, while this case involves the use of evidence obtained in violation of law, and that the deterrent policy of the exclusionary rule (*e. g.,* Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)) requires us to deny the government any benefit from an invasion of personal rights. But see Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (coerced confession).[2] But the defendant had ample opportunity at trial to prevent any ultimate prejudice stemming from the government's illegal actions. We do not mean to say that an indictment would always be unassailable, even when based on no competent evidence. *Cf.* United States v. Laughlin, *supra,* 226 F.Supp. at 114. Here there was ample competent evidence before the grand jury to justify bringing the defendants to trial on the conspiracy charge. *Cf.* Coppedge v. United States, 114 U.S.App.D.C. 79, 311 F.2d 128 (1962), cert. denied, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963). Nor can we say as a matter of law that the recordings might have had such force in establishing the conspiracy charge (as opposed to the perjury charge against Laughlin) that their admission tainted the entire proceedings.

It is argued further that the grand jury exhibited bias against both Forte and Laughlin. Most of the instances cited reflect only a natural reaction to the evidence that Forte and Laughlin had engaged in a criminal conspiracy and show, not that the jury was biased, but that it believed the evidence. One noteworthy incident occurred during

2. *See also Developments in the Law—Confessions,* 79 Harv.L.Rev. 935, 1055–1057 (1966),

Sgt. Wallace's testimony. Mr. Sullivan asked:

"And as a result of certain information which came to the attention of the United States Attorney from Mr. James J. Laughlin, did there come a time in the past several days that you checked out a story provided us by Mr. Laughlin that Jean Smith of the Baltimore area had a record or a reputation as a call-girl and prostitute?"

Wallace answered that his investigation showed only that a Jean Smith had once been arrested in Baltimore County for being drunk and disorderly. This prompted a juror to remark that "Mr. Laughlin seems to be throwing around an awful lot of accusations." And, very shortly, a juror (perhaps the same one) said:

"We had this charge interjected into this case against this Hill woman, the same charge. * * * And I think in the future, on these witnesses we have had an awful lot of counter-charges here, and a lot of people make countercharges when they are trying to cover up something against themselves. * * * I think this Grand Jury wants to hold this testimony on a little higher standards than Jim Laughlin's concept of trying a law case. That's all I have to say."

Although the record before us does not reveal the precise source of the other accusations that went to make up the "awful lot", we note that this one appears to have been injected gratuitously by Mr. Sullivan in a way that could have prejudiced Laughlin unfairly. That Laughlin made such an accusation, if in fact he did, would be relevant only on the tenuous theory that he thereby acted as a guilty man would. Such evidence would surely be inadmissible at trial, even if presented, as here it was not, by direct testimony rather than unsworn hearsay. Moreover, we are at least surprised that Wallace, who was himself an object of the grand jury's investigation, should be used as an in-

vestigator. The effect may well have been equivalent to an endorsement of his trustworthiness by the United States Attorney's office.

█ Nevertheless, although we may condemn this incident as bad practice in the abstract, we are not persuaded that the defendants were substantially prejudiced by it. The other competent evidence before the grand jury was ample to support the indictment; and in no way does this incident or any other incident in the record demonstrate the sort of general bias against the accused that would vitiate the proceeding and require dismissal of the indictment.

█ Coming to the trial itself, appellants' principal contention is that Mrs. Gross's testimony should have been excluded entirely, on two grounds: (a) that the statements of a coconspirator are inadmissible against anyone but himself unless there is substantial independent evidence tending to establish the existence of the conspiracy; and (b) that the testimony here was coerced and inherently incredible as a matter of law.

The first argument is based on a misunderstanding of the rule of law cited. That rule applies only to out-of-court (i.e., hearsay) statements of a coconspirator. E.g., Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). It does not exclude proof of a conspiracy by the direct testimony under oath of a party to it.

The second argument rests on what is asserted to be the coercive nature of the United States Attorney's interrogation of Mrs. Gross during the grand jury proceedings, on the established coercion in obtaining her permission to record telephone calls, and on allegations of her dealings with the United States Attorney that are wholly unsupported by the record. But we are not dealing here with the admissibility of an allegedly coerced confession against Mrs. Gross herself. Nor are we dealing with the use of such a statement against someone else. Cf. Turner v. Pennsylva-

nia, 338 U.S. 62, 65–66, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949) (dictum). Here Mrs. Gross testified directly in open court. That the substance of her testimony coincided with prior statements obtained under possible coercive circumstances is of no consequence, except perhaps as the jury might have considered it to bear on her credibility. As to that, the appellants were afforded and they exercised full opportunity on cross-examination to bring out, not only the circumstances of Mrs. Gross's prior statements to the United States Attorneys, but also her prior perjury before the grand jury and her hope of escaping indictment for her own part in the conspiracy.

■ Appellant Laughlin contends that the telephone company record cards, purporting to show calls between Mrs. Gross's telephone in Baltimore and various of Laughlin's telephones in Washington, should have been excluded from evidence because the same records were conclusively ruled inadmissible on the government's motion to vacate dismissal of the earlier perjury indictment. United States v. Laughlin, 226 F.Supp. 112 (D.D.C.1964), *supra*. But we do not read the decision in that proceeding as declaring the records inadmissible. The question before the district court was whether, when the illegally obtained tape recordings were excluded, the competent evidence before the grand jury was sufficient to support an indictment for perjury in view of the rule that perjury must be proved by at least the testimony of one witness plus convincing corroboration. 226 F.Supp. at 114. Thus, the court held only that the telephone record cards did not constitute convincing corroboration. But that is not to say that they do not constitute permissible corroboration in a nonperjury case. In fact, the reason for the district court's decision is that:

"These records prove only one thing, if they prove anything at all, and that is, telephone calls were made between certain telephone numbers. To argue

from a phone company record showing a call between certain phone numbers that the persons in whose names those phones are listed made the call is destructive of a very important rule of evidence; namely, that the person making the entry * * * should be making the entry based on personal knowledge. * * *" 226 F.Supp. at 113.

Here, before the cards were offered in evidence, Mrs. Gross testified that she had made or received calls to or from Laughlin at the days and times shown on the cards. It was permissible to show in corroboration that calls were in fact made between the relevant telephone numbers on those days at those times, and the cards were offered for no other purpose. There is no requirement in this case that the corroboration be convincing.

■ On cross-examination of appellant Forte, the government was allowed to ask: " * * * are you the same Allan U. Forte who, in March of 1942, under the name of A. U. Forte, in North Carolina, was convicted of abortion?" And Forte replied: "Yes, I was, but I was later pardoned by the Governor." Forte now argues that the trial court abused its discretion under the doctrine of Luck v. United States, 121 U.S.App. D.C. 151, 348 F.2d 763 (1965), in allowing the impeachment. On the contrary, the record shows that the trial court observed carefully the spirit of *Luck* in deciding to allow the question, while excluding mention of several later convictions in Maryland. The issue was heard out of the presence of the jury for nearly a day and a half of the trial. The certificate of pardon in no way indicated that it was grounded on Forte's innocence. On redirect examination Forte testified in explanation that he had pleaded *nolo contendere* to the charge because of a misunderstanding. Furthermore, despite the trial court's specific permission to protest his innocence, *see* United States v. Boyer, 80

U.S.App.D.C. 202, 150 F.2d 595, 166 A. L.R. 209 (1945), Forte did not do so.

■ Nor was there error in refusing a requested instruction that Forte's explanation and the pardon could be considered in evaluating his criminal record. The request was tendered after the entire charge had been given, long after Forte's counsel had specifically conceded that the court's instruction on the effect of the conviction was correct if the evidence of the conviction was properly admitted. Under the circumstances the court was well justified in refusing to argue the defendant's case.

■ Similarly, there was no error in refusing the immediately following request "that the jury be instructed, as Forte testified, his relation with Gross was instigated by Gross, and the purpose of their meeting and telephone conversations was for Gross to supply Forte with information concerning one Samuel Wallace."[3] The trial court is not required to rehearse the evidence, especially where the effect would be, as it would here, to give special emphasis to the defendant's testimony. This is not a case like Levine v. United States, 104 U.S. App.D.C. 281, 261 F.2d 747 (1958).[4] where there was a risk that the jury might find the defendant guilty although believing his testimony, because of failure to appreciate the significance of defendant's evidentiary theory.

■ In defining the government's burden to prove guilt beyond a reasonable doubt, the trial court said:

"* * * A reasonable doubt is one which is reasonable in view of all the evidence. Therefore, if after an impartial comparison and consideration of all the evidence you can candidly say that you have such a doubt as would cause you to hesitate to act in matters of importance to yourselves, then you have a reasonable doubt. But if after such impartial comparison and consideration of all the evidence, and giving due consideration to the presumption of innocence which attaches to the defendant, you can truthfully say that you have an abiding conviction of the defendant's guilt such as you would not hesitate to act upon in the more weighty and important matters relating to your personal affairs, then you have no reasonable doubt."[5]

Appellants assert that it was error not to add that reasonable doubt might arise from lack of evidence. To be sure, we have on occasion defined reasonable doubt as "a doubt arising from the evidence or from a lack of evidence, after consideration of all the evidence." *E.g.*, Bishop v. United States, 71 U.S.App. D.C. 132, 107 F.2d 297 (1939). But we did not thereby make our language the

---

3. We take it that the trial court interpreted this as a request that the jury be instructed to acquit Forte if they believed his testimony and not, as the language quoted seems to say, a request that Forte's testimony be declared true. After the request was denied, Forte's counsel submitted a written version for the record which cleared up the ambiguity, but otherwise added nothing significant.

4. In *Levine*, the defendant, a lawyer, was charged with falsely impersonating a police officer in attempting to obtain a statement from the prosecuting witness in a criminal case in which he represented the defendant. He testified that he had said that he was an attorney for the

defense and that he was an "officer of the Court and that it was my duty to find out what happened so that I could protect my client." 104 U.S.App.D.C. at 282, 261 F.2d at 748. In a sense these "special facts" constituted a sort of confession and avoidance which, though sounding like "impersonating a police officer", would, if believed, absolve the defendant. This is quite different from a "theory" that the conversations were innocent rather than conspiratorial.

5. We note that this charge is virtually identical in substance with the "exemplary" charge in Moore v. United States, 120 U.S.App.D.C. 203, 345 F.2d 97 (1965).

only correct formula. In fact, in a case where some lack of evidence for the government fairly creates a reasonable doubt of guilt, we may expect a normally intelligent jury to perceive that fact after comparison and consideration of all the evidence. *See* People v. Radcliffe, 232 N.Y. 249, 133 N.E. 577 (1921). But we need not declare that in all cases it would be correct to refuse a tendered instruction like the appellants' here. For here the appellants have made no attempt to show prejudice, and after reading the entire trial transcript we can see none.

Finally, appellants argue that they were gravely prejudiced by the trial court's reading to the jury paragraph six of count one of the indictment. That paragraph alleged that one of the objects of the defendants' conspiracy was to influence Mrs. Dorothy Birge, a material witness in the abortion trial. Count three, charging Forte with endeavoring to influence Mrs. Birge, had been dismissed before trial for failure to allege venue in the District of Columbia; but that did not make it improper to allege the same endeavor as part of the conspiracy. The jury was properly instructed that the indictment was not evidence. Moreover, when the court offered to clarify the significance of paragraph six, both appellants declined on the ground that it might "compound the effect that the reading of this might have". Even if paragraph six had not been a proper part of the indictment, we think an explanation and instruction to disregard would have been effective. This is not a case where inherently persuasive evidence was improperly admitted.

We have considered carefully all the other points raised by appellants in their brief and memoranda allowed to be filed after argument and find them wholly without merit. We are satisfied from our reading of the entire record that the trial was conducted in an exemplary manner, with notable concern to protect the appellants' rights.

Affirmed.