UNITED STATES, Appellant,

v.

Daron McMILLIAN, Appellee.

No. 05–CO–310.

District of Columbia Court of Appeals.

Argued Oct. 20, 2005.
Decided May 18, 2006.

---

Lisa H. Schertler, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Roger L. Kemp and Lynn C. Mattucci, Assistant United States Attorneys, were on the brief, for appellant.

Samia Fam, Public Defender Service, with whom James Klein was on the brief, for appellee.

Before FARRELL and REID, Associate Judges and TERRY, Senior Judge.*

REID, Associate Judge:

In this case, appellee Daron McMillian has been charged with several crimes, in-cluding the murders of Ricardo Minnis and Burl Lawson on July 6, 2000. By separate indictment, he was charged with other crimes, including the murder of Charles Lesane on August 31, 2000. His arrest for all three murders took place on August 31, 2000, and he confessed to all three murders on that day. However, the July 6 and August 31 murders have been handled as separate cases. In the case involving the Lesane murder, Mr. McMillian filed a motion to suppress statements which he made to the police on the day of his arrest. The Honorable Shellie Bowers granted his motion in 2003, and the government did not file an appeal.

In the case before us, Mr. McMillian also filed a motion to suppress—on both Fourth and Fifth Amendment grounds—the statements he had made on the day of his arrest, and that motion was granted by the Honorable Rhonda Reid Winston after finding that Mr. McMillian had been unlawfully detained earlier that day. (The judge did not reach the issue of whether Mr. McMillian's statements had been obtained in violation of the Fifth Amendment.). The government filed an appeal. The government primarily argues that the trial court erred by (1) failing to apply the "collective knowledge" doctrine concerning the basis for stopping Mr. McMillian for investigation; and (2) applying a "simple 'but for'" test to determine whether Mr. McMillian's statements that he committed the murders should be excluded from evidence under the "fruit of the poisonous tree" doctrine. Mr. McMillian argues that, having failed to appeal the decision granting his motion to suppress in the first case (the Lesane murder), the government is collaterally estopped from challenging his suppression motion in the second case (the Minnis/Lawson murders). We hold

---

* Judge Terry was an Associate Judge of the court at the time this case was argued. His status changed to Senior Judge on February 1, 2006.

that the government was not collaterally estopped from litigating Mr. McMillian's suppression motion in this case because the ruling in the Lesane murder case did not constitute a final judgment, and because there are policy considerations unique to criminal cases that make application of that doctrine inappropriate here. We also hold that the trial court was correct in concluding that Mr. McMillian was illegally seized. Nevertheless, applying the *attenuation doctrine to the particular facts of this case, we hold that the generation of probable cause to arrest Mr. McMillian within minutes of the detention broke the causal link between his illegal seizure and his confession.[1]

## FACTUAL SUMMARY

The record before us shows that Mr. McMillian was arrested on August 31, 2000, at approximately 2:35 p.m., and was later questioned about three murders (the Lesane, Minnis, and Lawson murders) between 6:30 p.m. on the same day, and continuing until 12:40 a.m. the following morning, September 1, 2000. At the suppression hearing in this case, held in February 2005, the government introduced the testimony of Sergeant Michael Dodgson of the United States Capitol Police ("Capitol Police" or "USCP"). Sergeant Dodgson and his partner, Officer Christopher Paradis were assigned to the K–9 patrol car. While they were placing the dog in their car, they "monitored a call on [a First District] [M]etropolitan [Police Department] radio that there was a shooting in the 900 block of 14th Street, Southeast." They needed gas for the car, and proceeded to a gas station at 4th Street and Pennsylvania Avenue, in the Southeast quadrant of the District of Columbia. Their attention soon focused on another crime.

As Sergeant Dodgson and his partner were filling their vehicle with gasoline, a manager of a Kinko's reproduction center, located in the 300 block of Pennsylvania Avenue, Southeast, approached and informed them "that two individuals snatched a lady's purse at Kinkos [and that] some [of his] employees [were] chasing the individuals eastbound on Pennsylvania Avenue." The manager described the purse snatchers as "two black males [in their] twenties, ... [wearing] a black T-shirt and the other one a yellow T-shirt." He stated that one of the chasers returned to say that the men had "boarded a [M]etro bus heading westbound ... [on] Pennsylvania Avenue." When Sergeant Dodgson and his partner saw a stationary bus, in the westbound direction on Pennsylvania Avenue, they got into their vehicle, turned on the "emergency equipment" and drove in front of the bus so that it would not pull away from the curb. It was 2:26 p.m.

Sergeant Dodgson informed the bus driver about the purse snatching and asked him to keep everyone on the bus. The driver "misunderstood [Sergeant Dodgson] and told people to get off the bus." People began to get off the bus at 2:27 p.m. Approximately thirty passengers exited from the front door. The last person off the bus was Mr. McMillian who "probably stayed on the bus maybe 40 or 50 seconds after everybody else." The first person to leave the bus was an elderly lady, who walked away. Another female person, who had been seated next to the elderly woman on the bus, told the sergeant that the elderly lady "said to [her] that she witnessed a shooting in the Potomac Gardens area," which is the area a few blocks away from the 900 block of 14th Street, Southeast, in which Charles Lesane

1. This conclusion does not relate to the *Miranda* issue that must be decided on remand.

was murdered. Upon hearing this information, Sergeant Dodgson used his Capitol Police radio to request that the elderly lady be stopped.

While Sergeant Dodgson was trying to keep the bus passengers together, he "noticed" Mr. McMillian walking away and "went over to him and . . . asked him to come back and just . . . stick around for a little while [because he] wanted to talk to everybody. . . ." Mr. McMillian complied. Sergeant Dodgson then returned to the female bus passenger to obtain "more information from her." When he realized that Mr. McMillian "was leaving a second time when everybody else was for the most part sticking around [and that he had reached] just beyond the bank at 6th and C Street," he proceeded to follow Mr. McMillian. As he did so, "another individual that was standing there stated to [him] . . . [,] be careful he's a bad ass." Sergeant Dodgson approached Mr. McMillian and said, "excuse me, . . . I need your help . . . . I'm looking for two suspects that snatched a lady's purse, I know you were on that bus, if you would come back with me[,] . . . I'll ask you a few questions and that will be it." Sergeant Dodgson spoke in a "firm" voice, but did not draw his gun. Mr. McMillian again complied with the sergeant's request. The two returned to the bus "side by side." By that time, most of the bus passengers had left the area, including the woman who had provided information about her elderly seat mate.

Around this time, which was approximately nine minutes from the time Sergeant Dodgson's vehicle positioned itself in front of the bus, Officer Pond of the Capitol Police had arrived. Sergeant Dodgson asked Officers Paradis and Pond to "keep an eye on [Mr. McMillian] . . . ." The sergeant then boarded the bus, went to "the back of the bus about where [he] had seen Mr. McMillian sitting prior to [his] exiting

the bus and [saw] a blue T-shirt sitting on the seat." The bus driver, who had followed Sergeant Dodgson, "said the guy that you brought back from behind the bank in the white T-shirt boarded my bus in the Potomac Gardens area and was wearing that shirt [meaning the blue T-shirt]." And, "at that point and time, [Sergeant Dodgson] thought that it's a possibility that Mr. McMillian could be the shooter," for the crime he was monitoring earlier. The bus driver said "when [Mr. McMillian] boarded the bus in the Potomac Gardens area he was wearing a blue T-shirt and he didn't pay the fare." When Mr. McMillian had exited the bus, he wore a white T-shirt. Sergeant Dodgson left the bus "and told Officer Paradis to handcuff Mr. McMillian." Sergeant Dodgson saw a Metropolitan Police Department ("MPD") officer, later identified as Sergeant Edward Smith, get on the bus, but apparently neither spoke at that time. Sergeant Dodgson asked Officer Paradis to secure Mr. McMillian.

Earlier on the same day, Sergeant Edward Smith, then attached to the MPD First District substation, had "monitored a radio run for . . . a shooting" in the 900 block of 14th Street, Southeast. The radio broadcast occurred around 2:27 p.m., and stated that "a possible suspect" was believed to be on a bus at 6th and Pennsylvania Avenue. He went to the location of the Metro bus and "observed two Capitol Police officers who were already there." Initially, he thought they also were investigating the shooting in the 900 block of 14th Street, S.E., but learned that they "were investigating a separate crime . . . ." An officer was standing outside the bus "near a male subject," who "was standing in the tree box area that [was] almost directly in front of the front entrance or exit of the Metro bus." At approximately 2:32 p.m., Sergeant Smith learned from the bus driver that the man the Capitol Police had

secured outside of the bus earlier "was moving around and up to something in the back of the bus and had in fact changed his clothes in the rear of the bus and left his shirt back there." The bus driver directed Sergeant Smith to the rear of the bus where Sergeant Smith saw "a dark blue shirt on the seat." There was nothing under the T-shirt, but when he "looked under the seat [Sergeant Smith] observed a semiautomatic pistol." He called for "transport" for Mr. McMillian around 2:33 p.m. When Sergeant Smith got off the bus, he told USCP Sergeant Dodgson and USCP Officer Paradis that "there was a gun ... under the seat in the bus in the back." Sergeant Dodgson "got back on the portable radio and voiced the urgency to get the elderly lady stopped."

After listening to dispatcher tapes the week before his testimony at the suppression hearing, USCP Sergeant Dodgson made some notes concerning time lines on August 31, 2000. His notes revealed that the bus was stopped at 2:25 p.m., and Mr. McMillian was "secured" "for investigative purposes" at 2:34 p.m. Sergeant Dodgson also stated that he signed and filed a PD–252 report which was prepared by someone else, and that some of the information on that document was incorrect. In response to the question whether Mr. McMillian was "cuffed before [Sergeant Dodgson] learned that the gun was found by the [M]etropolitan police officer," the sergeant responded: "Yes." He stated that there were only "[s]econds" between the handcuffing of Mr. McMillian and the moment the gun was found. "Seconds after

[Mr. McMillian] was handcuffed, MPD Sergeant Smith c[a]me[ ] off the bus and mention[ed] the gun." [2]

Sergeant Mark Moore of the MPD was at the crime scene in the 900 block of 14th Street, S.E., when he received a call that took him to the site of the bus stopped at 6th and Pennsylvania Avenue, S.E. He arrived at the bus at 2:34 p.m. and saw Sergeant Smith on the bus. When Sergeant Moore boarded the bus, Sergeant Smith "said that he had found a weapon on the back of the bus under the seat"; Sergeant Moore also saw the gun. As Sergeant Moore got off the bus, another officer was on the scene, Lieutenant McGill, who observed three 9mm rounds or bullets "in [t]he tree box space which was adjacent to the bus as you exit the front door."

Detective Oliver Garvey of the MPD had been assigned to the investigation of the shooting on August 31, 2000. He testified at the suppression hearing that another MPD officer, Katrina Harris, "received a call from an anonymous caller." The caller stated that she observed a black male "wearing a white T-shirt and some blue jeans" board a bus "traveling westbound on Pennsylvania Avenue, Southeast." The man had taken off a blue shirt and used it to wrap a gun.

Detective Garvey interviewed the bus driver on August 31, 2000. After Mr. McMillian got on the bus, another passenger reported, based on information from an elderly passenger, that the man in the back wearing a blue T-shirt had "just shot

2. About the time Sergeant Smith got off the bus, and right after Mr. McMillian had been placed in a police cruiser, the bus driver had a conversation with Officer Paradis that occurred "within 10–15 minutes ... of stopping the bus ...," and "maybe 30 seconds after Sergeant Dodgson asked Officer Paradis to secure Mr. McMillian." The bus driver said that "the guy [Sergeant Dodgson] brought

back from behind the bank in the white T-shirt boarded his bus in Potomac Gardens" and "the elderly lady that was sitting on the bus told him that she witnessed a shooting and the individual was the guy back there that was sitting in the seat with the white T-shirt on"; and that Mr. McMillian was seated "in the rear of the bus, on the ..., if you are looking at the rear of the bus, the left side."

somebody on 14th Street." The bus driver remembered that the man had on a white T-shirt when he got on the bus, but now was wearing a blue T-shirt. The bus driver radioed this information to his dispatcher, and pretended that the bus was having some engine problems, and hence, could not be driven.

Detective Garvey also testified that when he reached the bus stopped at 6th and Pennsylvania Avenue, S.E., it was somewhere around 3:15 or 3:20 p.m. He learned of the shell casings found in the tree box from Lieutenant McGill. Mr. McMillian was in a police transport vehicle at the time, and was then "transported to the first police district." After spending time at the bus site, Detective Garvey arrived at the police station around 5:45 p.m. Mr. McMillian had not been told that he was arrested for carrying a pistol without a license until Detective Garvey revealed the charge to him that evening. Detective Garvey's first contact with Mr. McMillian at the police station occurred around 6:30 p.m. Detective Fulton, who was involved in the investigation of the July 6, 2000 murders, also was present. Detective Garvey told Mr. McMillian that he "was going to read him his rights because [he] did not want to violate his rights ... [but he] wanted [Mr. McMillian] to listen to what [he] had to say and just to listen, not interrupt [him], just to listen." Detective Garvey spoke about the August 31, 2000, shooting, the discovery of the gun on the bus, and the detectives' "belie[f] that [Mr. McMillian] was responsible for that." Detective Fulton also expressed his view that Mr. McMillian "was involved in the double homicide that occurred earlier that summer," the Minnis/Lawson murder.

In addition, Detective Garvey mentioned self-defense and Mr. McMillian's "right to defend himself," if he feared for his life. Mr. McMillian inquired whether the right to self-defense was "in black and white," and asked to be shown. The detectives then pulled out the D.C.Code, "highlighted the area of the self-defense issues [and] read it to [Mr. McMillian]." Mr. McMillian then said, "Give me a soda and some cigarettes and I'll tell you what you want to know." The detectives gave him a cigarette and soda, and then "read him his rights." Mr. McMillian "admitted his involvement in the double homicide, as well as his involvement in the homicide that occurred that day." It was approximately 7:35 p.m. when Mr. McMillian's rights were read to him. Mr. McMillian signed the PD–47 card, waiving his rights. Mr. McMillian was questioned for two hours, and allowed a break of one and one-half hours, followed by a repetition of the *Miranda* warnings and a videotaped statement which ended at 12:40 a.m.

Issues relating to the validity of the stop and subsequent arrest of Mr. McMillian on August 31, 2000, were first addressed in the case involving the Lesane murder. In that case, the Honorable Shellie Bowers granted Mr. McMillian's motion to suppress evidence, specifically the clothing Mr. McMillian was wearing on August 31, 2000, at the time of his arrest, as well as any statements he made to the police on that day, because under the Fourth Amendment to the Constitution of the United States the police lacked probable cause to arrest him. Judge Bowers emphasized that "the arrest took place at 2:35 p.m.[, and] [t]he gun was not found until 4:00 p.m." Moreover, Judge Bowers "[found] that this whole thing boils down to the little old lady," and she denied seeing a shooting in the Potomac Gardens area. The government later, on a motion to reopen, presented evidence to Judge Bowers that the gun had been discovered at around 2:33 p.m., but the judge declined to reopen the suppression hearing, finding in effect, that the government's failure to

introduce the evidence earlier was not excusable. The government did not appeal Judge Bowers' ruling although the indictment was still pending trial at the time of the instant proceeding.

Early in the proceedings in the instant case concerning the Minnis/Lawson murders, Judge Winston, in response to Mr. McMillian's argument, considered whether the government was collaterally estopped from re-litigating the suppression motion. After hearing the argument and reviewing the case law, Judge Winston concluded that the government was not collaterally estopped from litigating the suppression motion under a Supreme Court case, *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), which examined a constitutional double jeopardy contention. With respect to the common law doctrine as discussed in *Laughlin v. United States,* 120 U.S.App.D.C. 93, 344 F.2d 187 (1965), Judge Winston determined that "there was a full and fair opportunity for this issue of the legitimacy of Mr. McMillian's arrest to have been litigated in the prior proceeding," but that Judge Bowers' suppression ruling was not a "final judgment." She declared: "I find that *Laughlin* does apply or would apply but for the fact that Judge Bowers' ruling was not a final order."

Following the presentation of testimony on the motion to suppress and the arguments of the parties, the court announced its ruling on the Fourth and Fifth Amendment issues related to the suppression motion. Judge Winston determined that when Mr. McMillian first got off the bus, began to walk away, and was asked by Sergeant Dodgson to return, he was not "seized." However, the second time that Mr. McMillian began to walk away after being "asked to stay" by the bus, he was "seized" since Sergeant Dodgson followed him to the bank at 6th and C, "[t]old him to come back," "sort of waited for him and walked back [with Mr. McMillian] to the tree box near the front of the bus side by side," and instructed Officers Paradis and Pond to "stay with him." As Judge Winston stated, in part:

> Having tried to go once and been summoned back, having left again and almost having been escorted for part of the way back to where at least one but maybe two Capitol police officers were there in the tree box, and having heard Sergeant Dodgson tell the officers to stay with him until he saw what he had, the court finds that no reasonable person would have felt that they were free to go.

The trial court based its ruling on "what Sergeant Dodgson [and Officer Paradis] knew,... [b]ecause despite the existence of the collective knowledge doctrine, there is no indication that ..., the Capitol police officers and the Metropolitan police officers, were acting together .... [T]hey were acting completely separately and independently." When Sergeant Dodgson "stopped" or "seized" Mr. McMillian, he knew that a shooting had occurred in the 900 block of 14th Street, S.E.; there had been a reported robbery at Kinko's; some of Kinko's employees had seen "two black males get on a bus that was going westbound on Pennsylvania Avenue"; Mr. McMillian was the last person (30–50 seconds after the other passengers) to get off the bus that had been stopped; Mr. McMillian had been seated in the rear of the bus; a "40–something–year–old" lady had told him that an elderly woman had witnessed a shooting and that the shooter was on the bus; several black males were on the bus and had on white T-shirts, but none wore a yellow or black T-shirt; and Mr. McMillian had left the area of the bus once and had returned, and walked away again and had come back. After reviewing the testimony at both suppression hearings (in 2003 and 2005), Judge Winston did not

credit Sergeant Dodgson's testimony that the forty-year-old lady "told him that the shooter was on the rear of the bus."

Thus, the trial court found that Sergeant Dodgson did not have "sufficient information under *Terry* ... to stop Mr. McMillian." Kinko's employees described the two black males as wearing a yellow and a black T-shirt. The other descriptions were "general ..., black males in their 20's." The court concluded that "the articulable suspicion must be particularized as to the individual stopped," but that, here it was "inchoate and unparticularized suspicion or hunch."

With respect to the time of Mr. McMillian's arrest, the trial court determined that when Mr. McMillian was handcuffed, he was not under arrest. However, "the police had probable cause to arrest him for carrying a pistol without a license shortly after he was detained or shortly after he was stopped." The court added:

So if it were not for the fact that [Mr. McMillian] had been illegally stopped initially in the tree box, then certainly when he was arrested, the police would have had probable cause. But the first stop in the tree box, in the Court's view, was not supported under *Terry*.

And while the government has argued that the discovery of the gun followed close on the heels of the time that Mr. McMillian was held there in the tree box by—or shortly after Sergeant Paradis was told to stay with Mr. McMillian, in the Court's view, ... it doesn't justify what happened[, b]ecause although the police might certainly quickly thereafter have discovered the gun, they would not, had they not stopped him in the tree box, have had him; and the statement is a product of his detention.

So I do find that the statement must be suppressed.

## ANALYSIS

### *Collateral Estoppel*

 The government challenges the trial court's ruling on the merits of Mr. McMillian's motion to suppress his confession to the Minnis and Lawson murders. Mr. McMillian argues, however, that an earlier court ruling by Judge Bowers, involving a different case (the Lesane murder) but the same stop and seizure of his person, "had preclusive effect in this case," and hence, the government was collaterally estopped from relitigating the suppression issue. Before turning to the merits of the government's argument, we consider the applicability of the collateral estoppel doctrine to the suppression issue raised in this case.

 In *United States v. Felder*, 548 A.2d 57 (D.C.1988), "we [were] called upon to determine whether the doctrine of collateral estoppel as a component of the Double Jeopardy Clause of the Fifth Amendment as enunciated in *Ashe*[, *supra*], and its progeny prevents the government from relitigating certain facts at a second trial." *Id.* at 58. We concluded that our review was *de novo*. *Id.* at 58, 65. Even though the issue presented here is primarily one of common law application, rather than the Double Jeopardy Clause, our standard of review also is *de novo* because we face a question of law. *See Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995) (referencing *Smith v. Jenkins*, 562 A.2d 610, 613 (D.C.1989)).

As they resolved Mr. McMillian's suppression motions, both Judges Bowers and Winston focused on whether the same statement given by Mr. McMillian to the police on August 31, 2000, should be suppressed. Judge Bowers concluded that the police did not have probable cause to arrest Mr. McMillian because the elderly lady ultimately said she did not see a

shooting near Potomac Gardens and in light of the fact that Mr. McMillian's arrest came hours before the gun was found under the rear seat of the bus. Judge Winston, operating on different evidence pertaining to the time of the discovery of the gun on the bus in relation to the time of Mr. McMillian's arrest, determined that the police had probable cause to arrest Mr. McMillian upon finding the gun in the rear of the bus, but that he had been previously seized—without reasonable suspicion—after he walked away from the bus and Sergeant Dodgson directed him to "come back," walked back with him "side by side," and instructed the two officers to "stay with him." Since Mr. McMillian's seizure was illegal, and since he would have left the scene except for the seizure and not been available (at least immediately) to be arrested, the judge found that his confession was the product of his illegal detention.

 The collateral estoppel doctrine, which has its roots in the civil law,[3] "prevent[s] repetitious litigation of the same issue by the same parties." *Laughlin, supra,* 120 U.S.App. D.C. at 95, 344 F.2d at 189 (footnote omitted). Specifically, collateral estoppel "applies generally to preclude relitigation of an issue resolved by *final judgment* in a prior legal action." *Id.* (footnote omitted) (emphasis added). As this court said in *Johnson v. District of Columbia,* 853 A.2d 207, 211 (D.C.2004), "[c]ollateral estoppel 'means simply that when an issue of ultimate fact has been once determined by a *valid and final judgment,* that issue cannot be litigated between the same parties.'" *Id.* at 211 (em-

phasis added) (quoting *Ashe, supra,* 397 U.S. at 443, 90 S.Ct. 1189). *Laughlin* declared: "[I]t is well established that the principles of collateral estoppel apply in criminal, as well as in civil, litigation." 120 U.S.App.D.C. at 95–96, 344 F.2d at 189–90 (footnote omitted).

The applicability of the collateral estoppel doctrine in a case like the one before us, which does not (as both the government and Mr. McMillian agree) implicate the Double Jeopardy Clause, is a matter of first impression in this jurisdiction. *See Johnson, supra; Jones v. United States,* 669 A.2d 724 (D.C.1995). In our past cases, we have been reluctant to fully embrace res judicata and collateral estoppel principles in criminal cases. In fact, in *Kleinbart v. United States,* 604 A.2d 861 (D.C.1992), we declared, "the doctrine [of res judicata] has only limited applicability in the criminal context." *Id.* at 864. Consistent with our view of limited applicability, we have applied the collateral estoppel doctrine in criminal cases where constitutional double jeopardy has been implicated. *Jones, supra; see also Johnson, supra,* 853 A.2d at 213 (an evidentiary collateral estoppel case in which we declined to hear the interlocutory appeal "because jeopardy never attached at the suppression hearing ....").

Despite these pronouncements of reluctance to apply collateral estoppel principles in criminal cases, beyond those implicating double jeopardy, Mr. McMillian argues that *Laughlin,* a case decided under common law principles, not only is favorable to his position, but also binds

---

**3.** *See Davis, supra,* where we said that collateral estoppel or issue preclusion

renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and

fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

663 A.2d at 501 (citing *Washington Med. Ctr. v. Holle,* 573 A.2d 1269, 1283 (D.C.1990)) (other citations omitted).

this court in that it gave "conclusive effect to a suppression order entered in a previous case when the government tried to relitigate the issue in a subsequent prosecution on different charges." While collateral estoppel principles can apply to criminal cases, we cannot agree that *Laughlin* requires us to hold that Judge Bowers' ruling on the suppression motion in the separate case pertaining to the Lesane murder binds Judge Winston in this case relating to the Minnis and Lawson murders. This is not a case involving the relitigation or retrial of the Lesane murder. Hence, we are not confronted with a question of direct estoppel—that is, "[i]ssue preclusion 'within the confines of a single claim or cause of action.'" *United States v. Bailin*, 977 F.2d 270, 276 (7th Cir.1992); *see also Massachusetts v. Williams*, 431 Mass. 71, 72 (2000); *Connecticut v. Knight*, 266 Conn. 658, 835 A.2d 47, 53 (2003).

Furthermore, *Laughlin* is an unusual case, decided prior to the Supreme Court's decision in *Ashe*. It differs factually and in its posture from Mr. McMillian's situation. There, appellants were found guilty of a conspiracy to commit an offense against the United States by influencing the actions of a material witness [Mrs. Smith] in an earlier criminal prosecution against Mr. Laughlin's codefendant. At issue was the testimony of an unindicted co-conspirator, Mrs. Gross. Her testimony "was corroborated by Mrs. Smith," and also "by tape recordings" of conversations between Mrs. Gross and Mr. Laughlin. *Laughlin*, *supra*, 120 U.S.App. D.C. at 95, 344 F.2d at 189. The tape recordings had been excluded previously in Mr. Laughlin's prior perjury case, on a motion for a mistrial, because they had been made without Mrs. Gross' consent and in violation of federal law. Subsequently, the United States District Court for the District of Columbia granted Mr. Laughlin's motion to dismiss

the perjury indictment because the remaining evidence was "not sufficient to sustain the indictment." *Id.* (footnote omitted). Thus, jeopardy attached with respect to that charge. Mr. Laughlin argued in the second case, the conspiracy matter, that the doctrine of collateral estoppel precluded relitigation of the coercion issue. Contrary to the judge's findings in the earlier perjury case, the judge in the conspiracy case found that Mrs. Gross' consent was not coerced. Mr. Laughlin maintained that the second finding in the conspiracy case was barred by collateral estoppel.

The *Laughlin* court rejected the government's argument that the resolution of the consent issue was not a final judgment. The court determined that the government did not appeal the consent ruling in the perjury case, but had had a full and fair opportunity to present relevant evidence on the consent issue. The court also found unpersuasive the government's argument that coercion was not an ultimate fact, concluding that " '[u]ltimate facts' are ... those which the law makes the occasion for imposing its sanctions," *id.* at 190 (citation and other internal quotation marks omitted), and that coercion of Mrs. Gross was an ultimate fact. Ultimately, collateral estoppel was applied in *Laughlin* because there was an earlier "final judgment in the District court [the court had dismissed the indictment], [and] the Government should have pursued its appeal or acquiesced in the judgment." *Id.* at 192.

In cases decided subsequent to *Laughlin*, we adhered to the requirement of a "final judgment" and did not stray far from the double jeopardy context in applying the estoppel doctrine to criminal cases. As we said in *Washington v. United States*, 366 A.2d 457 (D.C.1976), "[c]ollateral estoppel operates on a fact or ruling established in a prior cause of action by a

final judgment on the merits. The instant case does not involve ... a previous final judgment on the merits. Thus, collateral estoppel is ... inapplicable." *Id.* at 460 (citing *Laughlin, supra*) (other citation omitted). And, in *Copening v. United States,* 353 A.2d 305 (D.C.1976), we did not apply the collateral estoppel doctrine because no prior final judgment had issued. *Id.* at 310 ("The existence of a prior judgment has been described as the 'linchpin' of [*Ashe, supra*], and subsequent case law has stressed the requirement of a previous trial.... [W]e conclude that there was no 'prior adjudication' which would mandate application of the collateral estoppel doctrine.") (citations omitted). *Copening* was decided after the Supreme Court of the United States' decision in *Ashe, supra,* which declared that the "established rule [of collateral estoppel in criminal cases] is embodied in the Fifth Amendment guarantee against double jeopardy." 397 U.S. at 445, 90 S.Ct. 1189.[4]

In the late 1980s and beyond, as we began to face issues of first impression in criminal cases and arguments that the collateral estoppel doctrine should be applied, our cases reflect a cautious approach. The issue in *Jackson v. United States,* 528 A.2d 1211 (D.C.1987) was "whether collateral estoppel would apply when the defendant could not have been prosecuted for the greater offense [second-degree murder] at the time of the first trial and was acquitted [of a lesser charge]." *Id.* at 1221 (footnote omitted). We held that "although collateral estoppel principles incorporated in the

double jeopardy clause [did] not, the ex post facto clause [did] bar the prosecution of appellee for second-degree murder." *Id.* at 1212. We emphasized that the Supreme Court in *Ashe, supra,* "forewarned ... that the collateral estoppel rule 'is not to be applied with the hypertechnical and archaic approach of a 19th Century pleading book, but with realism and rationality.'" *Id.* at 1221 (quoting *Ashe, supra,* 397 U.S. at 444, 90 S.Ct. 1189). *Ashe* also explained that the "inquiry" as to the applicability of the collateral estoppel rule "'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" 397 U.S. at 444, 90 S.Ct. 1189 (quoting *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948)).

*Kleinbart, supra,* concerned pretrial detention issues and we considered whether the doctrines of *res judicata* (as invoked by the government) and collateral estoppel were applicable. We stressed that the res judicata "doctrine has only limited applicability in the criminal context." *Id.* at 864. We also focused on what constitutes a "final judgment," saying:

> In criminal law, the issue of finality is generally dealt with under the double jeopardy clause of the Fifth Amendment of the Constitution. Collateral estoppel, a doctrine related to (and often considered part of) *res judicata,* is one component of the double jeopardy clause. *See* [ ] *Felder,* [*supra,*] 548 A.2d [at] 65[ ]. Collateral estoppel "means simply that when an issue of ultimate fact has once

---

4. The Seventh Circuit has interpreted *Ashe's* linkage of collateral estoppel and the Fifth Amendment as follows:

> The fact that issue preclusion will apply only in situations where double jeopardy does not suggests a better reading of the Supreme Court's pronouncements that collateral estoppel is a "component" of the Double Jeopardy Clause: issue preclusion

in criminal cases, though applicable to the states through the Fifth and Fourteenth Amendments to the United States Constitution, is an additional double jeopardy protection necessary to give full effect to the protection due a defendant after a full or partial acquittal.

*Bailin, supra,* 977 F.2d at 276 n. 8.

been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* (quoting *Ashe* [ ], [*supra*], 397 U.S. [at] 443[ ]). Collateral estoppel, however, generally applies only when a verdict has been reached and either the government attempts to relitigate a factual issue in a second criminal action, *e.g.*, *Felder*, 548 A.2d at 65–67, or the defendant attempts to relitigate a factual issue in a related civil action. Because this case deals with a detention order and not with a verdict, and because appellant raises questions of law rather than of fact, we conclude that the preclusion doctrine of collateral estoppel is . . . not applicable.

*Id.* at 865 (other citations and footnote omitted).[5] In analyzing the concept of "final judgment" in *Kleinbart, supra*, we relied on § 13 of the RESTATEMENT OF THE LAW (SECOND) JUDGMENTS (1982) which provides:

The rules of res judicata are applicable only when a final judgment is rendered.

However, for purposes of preclusion . . . , "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

The Supreme Court in *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916) focused on an acquittal or conviction as the hallmarks of a final judgment in a criminal case: "Where a criminal charge has been adjudicated upon by a court having jurisdiction to hear and determine it, that adjudication, whether it takes the form of an acquittal or conviction, is final as to the matter so adjudicated upon, and may be pleaded in bar to any subsequent prosecution for the same offence. . . ." *Id.* at 88, 37 S.Ct. 68.

Not only have our cases adhered to the requirement of a final judgment in cases where application of collateral estoppel is sought, but they also have emphasized the different policy considerations pertaining to the prosecution of criminal cases, in contrast to those relating to civil cases. As we recognized in *Washington, supra*,

---

**5.** Thus, "appealability" is not equal to "finality." A matter may be appealable where there is no final judgment. Mr. McMillian argues, however, that "numerous jurisdictions have applied collateral estoppel against the government after it lost a suppression hearing when the order was subject to appeal." For example, he cites *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1265–66 (2d Cir. 1975), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). The section of the case on which Mr. McMillian relies contains a hypothetical case based on two indictments resulting from one bank robbery, the second indictment concerning a stolen vehicle used after the bank robbery. Not only is the hypothetical different from the separate murder cases at issue before us, but the court's discussion of this hypothetical case, as the government indicates, is dicta. In addition, in *Williams, supra*, the Supreme Judicial Court of Massachusetts was careful to note that the "case concerns a matter of direct estoppel because the issue actually litigated

and decided between the Commonwealth and the defendant arises in identical indictments that charge the same criminal offense." 725 N.E.2d at 220 n. 4. The Massachusetts court also recognized that: "Courts that have dealt in various contexts with the question of issue preclusion because of unappealed suppression orders have reached different results." *Id.* at 220 (citing cases). *Oregon v. Swain*, 267 Or. 527, 517 P.2d 684, 686 (1974) is not persuasive authority, since there was some confusion as to what the first judge ruled, because his oral pronouncement actually dismissed the information on which the charge was based, but his written order granted the government fifteen days to decide whether to continue the proceedings. At any rate, another court has declined to follow *Swain*. *See Wisconsin v. Miller*, 274 Wis.2d 471, 683 N.W.2d 485, 490–91 (Ct.App.2004) (indicating that decision lacks "analysis" and there is "no explanation or logic supporting the bald conclusion that the appealability of an order makes it a final judgment on the merits. . . .").

where we quoted Professor Scott, one of the co-reporters of RESTATEMENT OF JUDG-MENTS, "the application of *res judicata* in criminal cases presents 'questions of policy quite different from those applicable to civil proceedings.'" 366 A.2d at 460 (quoting 39 IOWA L. REV. 214, 216 (1954)). And, res judicata and collateral estoppel "rules must, at times, yield to paramount competing interests." *Burrell v. United States,* 252 A.2d 897, 900 (D.C.1969) (citation omitted). The case before us raises a significant policy issue—whether the collateral estoppel doctrine should be applied in a case involving different murders with different victims that were not indicted together. Stated differently, the issue is whether negligence by the government in presenting its evidence in one case, resulting in exclusion of evidence of a murder, should operate further to deny the trier of fact probative and reliable evidence of guilt in a prosecution for unrelated murders. We believe that in such a case as this "[t]he common law doctrine of collateral estoppel ... is not to be rigidly or mechanically applied and must on occasion, yield to more fundamental concerns." *New York v. Plevy,* 52 N.Y.2d 58, 436 N.Y.S.2d 224, 417 N.E.2d 518, 521 (1980).

More fundamental concerns here are the enforcement of criminal laws designed to protect communities, and the public interest in the prosecution of crimes against persons. If these concerns are to be considered, collateral estoppel "cannot be applied [to criminal cases] in quite the same way as civil cases." *Id. See also New York v. Hilton,* 95 N.Y.2d 950, 722 N.Y.S.2d 461, 745 N.E.2d 381, 382 (2000) (collateral estoppel principles "are not to be liberally applied in criminal cases."); *Pinkney v. Keane,* 920 F.2d 1090, 1096 (2d Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991). As of 1993, when the Court of Appeals of New York decided *New York v. Aguilera,* 82

N.Y.2d 23, 603 N.Y.S.2d 392, 623 N.E.2d 519 (1993), a case involving separate trials for two murders committed on different dates, the New York court had "actually employed the [collateral estoppel] doctrine only once in a criminal case [ ] to preclude the People from relitigating the fact of defendant's alleged presence at a crime scene." *Id.* at 522 (citing *New York v. Acevedo,* 69 N.Y.2d 478, 515 N.Y.S.2d 753, 508 N.E.2d 665 (1987)). *Aguilera* determined that the first ruling on the suppression motion constituted a final judgment when, in contrast to the case before us, the defendant was convicted in the first murder case. The collateral estoppel rule was not applied, however, because the defendant did not testify, and hence, did not have a "full and fair opportunity" to litigate the suppression motion in the first case. *Id.* at 524 (referencing *Plevy, supra,* 436 N.Y.S.2d 224, 417 N.E.2d at 522). In reaching this conclusion the court "consider[ed] the realities of the [prior] litigation, including the context and other circumstances ...." *Id.* (internal quotations and citation omitted). And, in *New York v. Hilton,* 95 N.Y.2d 950, 722 N.Y.S.2d 461, 745 N.E.2d 381 (2000), the court again stressed policy considerations unique to criminal cases:

> Strong policy considerations militate against giving issues determined in prior litigation preclusive effect in a criminal case, and indeed we have never done so (*see* [ ] *Plevy* [, *supra,* 436 N.Y.S.2d 224, 417 N.E.2d at 522] n. 4). The correct determination of guilt or innocence is paramount in criminal cases ..., and the People's incentive to litigate in a felony prosecution would presumably be stronger than in a parole revocation proceeding.

*Hilton, supra,* 722 N.Y.S.2d 461, 745 N.E.2d at 382 (quoting *New York v. Fagan,* 66 N.Y.2d 815, 498 N.Y.S.2d 335, 489

N.E.2d 222, 223 (1985)) (other citation omitted). Even assuming that Judge Bowers' unappealed ruling on the suppression motion in the Lesane murder case was tantamount to a final judgment in that case, "strong policy considerations" attached to criminal cases would dictate against application of the collateral estoppel doctrine to the case before us. Here, as we have indicated, the government is not relitigating or retrying the Lesane murder case. Rather, we are faced with a case of "non-mutual offensive collateral estoppel" where the government has not yet had a "full and fair opportunity to litigate" issues surrounding the Minnis/Lawson murders. *See Bailin, supra,* 977 F.2d at 276 (citing *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)); *see also United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).

Moreover, there would be significant costs if, as Mr. McMillian maintains, the government were held to have forfeited its right to argue the admissibility of his confession in this case by not having appealed from Judge Bowers' suppression order—on a different evidentiary record—in the Lesane case.[6] Professor LaFave in his treatise on search and seizure has pointed out the "added burden for both [the prosecution] and the defense" if the prosecutor were "forced to take an appeal [in the first case] in order ... not to be precluded regarding the admissibility of [evidence] in any future case." 5 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 11.2(g), at 103 (4th ed. 2004). *See also id.* ("[I]f it were necessary to appeal solely for the purpose of avoiding the application of the rule of issue preclusion, then the rule might be responsible for increasing the burdens of litigation on the parties and the courts rather than lightening those burdens.") (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28 comment I (1980)). *And see Standefer, supra,* 447 U.S. at 23–24, 100 S.Ct. 1999 (noting, as reason militating against applicability of collateral estoppel to the government in criminal cases, limits on the government's right to appeal in such cases). Under the circumstances of this case, rigid application of collateral estoppel principles is inappropriate. The trial court correctly determined that collateral estoppel did not bar the government from litigating the suppression motion filed in this case by Mr. McMillian.

### The Suppression Issue

■ The government argues that "[t]he trial court erred by finding that Officers Dodgson and Paradis violated the Fourth Amendment" because "the police acted reasonably." In addition, the government asserts, "the trial court erred again when it found that the alleged *Terry*[7] violation required suppression of appellee's confession to the Minnis/Lawson murders" because Mr. McMillian's "confession occurred several hours after he was arrested by MPD for CPWL [and][t]hat arrest was based on probable cause." Consequently, the government contends, "even if a brief unlawful *Terry* stop occurred prior to [Mr. McMillian's] arrest, his confession was not 'come at by exploitation of that illegality'; it was obtained 'by means sufficiently distinguishable to be purged of the primary taint,'" citing *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and *Brown v. Illinois,* 422 U.S.

---

6. Given the absence of probable cause on the evidence initially presented to Judge Bowers, and the strongly discretionary nature of his refusal to reopen that suppression hearing, it is not surprising that the government elected not to appeal from his order excluding evidence.

7. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The government also faults the trial court for not applying the collective knowledge doctrine with respect to what the both the Capitol police officers and the MPD police officers knew at the time Mr. McMillian was seized. Mr. McMillian maintains that "Judge Winston correctly ruled that the police detained [Mr.] McMillian without reasonable articulable suspicion ... that he had committed either the Kinko's robbery or the shooting"; and that the judge correctly ruled that the collective knowledge doctrine was inapplicable on the facts of this case. Moreover, Mr. McMillian insists that the government has waived the argument "that even if the police violated [Mr.] McMillian's Fourth Amendment rights, the ensuing statement was too attenuated from the illegality to be suppressed." The sole focus of the hearing before Judge Winston, he argues, "was to adduce evidence of probable cause" and "the government did not seek leave to expand its arguments to include attenuation."

 "Although this court defers to relevant factual findings by the trial court, we review *de novo* the ultimate question of whether a seizure was supported by reasonable suspicion." *McFerguson v. United States,* 770 A.2d 66, 73 n. 10 (D.C.2001) (citing *United States v. Turner,* 699 A.2d 1125, 1127 (D.C.1997)). "While the Fourth Amendment imposes only 'some minimal level of justification to validate [a seizure],' a reasonable suspicion must be one 'particularized as to the individual stopped.'" *Id.* (quoting *I.N.S. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) and *Turner, supra,* 699 A.2d at 1128). *See also Wilson v. United States,* 802 A.2d 367, 369 (D.C.2002) ("While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponder-

ance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.") (citing *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

The record shows that Judge Winston carefully and meticulously considered whether and the point at which Mr. McMillian was seized, and whether the police had reasonable, articulable suspicion at that point. She properly focused on the case law, particularly *Terry, supra,* and *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.") (citing *Terry, supra,* 392 U.S. at 19, n. 16, 88 S.Ct. 1868; *Dunaway v. New York,* 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and W.R. LaFave, Search and Seizure § 53–55 (1978)). *See also Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *Jackson v. United States,* 805 A.2d 979, 983–84 (D.C.2002) ("In determining whether the person has been seized, the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (internal quotations omitted). Based upon our review of the record, and considering the applicable legal principles, we are satisfied that Judge Winston correctly ruled that Mr. McMillian was seized the second time he walked away from the bus, when he was followed by Sergeant Dodgson and

accompanied back to the bus by the officer, told to stay by the bus, and Officers Paradis and Pond were instructed to stay with him. At that time, however, Sergeant Dodgson did not have "a reasonable, articulable suspicion that criminal activity may be afoot"; rather he "had only an 'inchoate and unparticularized suspicion or hunch' of criminal activity" on the part of Mr. McMillian. *Wilson, supra,* 802 A.2d at 369 (citing *Terry, supra,* 392 U.S. at 27, 88 S.Ct. 1868) (other citations and other internal quotation marks omitted). As Judge Winston recognized, Sergeant Dodgson lacked reasonable suspicion " 'particularized to the individual stopped.' " *Turner, supra,* 699 A.2d at 1128. Even if we aggregated the knowledge (*see McFerguson, supra,* 770 A.2d at 72) of Sergeant Dodgson of the Capitol Police and that of Sergeant Smith and Detective Moore of the MPD at the time Mr. McMillian was seized, based upon the trial court's factual findings, it would have been insufficient to provide reasonable suspicion that Mr. McMillian had been involved in criminal activity relating either to the purse snatching at Kinko's or the 14th Street shooting.

■ Nevertheless, the government argues that under the attenuation doctrine, Mr. McMillian's confession should not have been suppressed because the taint of the illegal seizure, which occurred hours before the appellant was interrogated by Detective Garvey, had been purged by the time he confessed. Mr. McMillian contends that the government did not raise the attenuation doctrine in the trial court and has therefore waived it. The government maintains that the issue was preserved because Mr. McMillian "concedes" that *Wong Sun* and *Brown* were cited in Mr. McMillian's suppression motion, "the prosecutor 'stressed' to Judge [ ]Winston . . . that 'police acquired the evidence [of probable cause] quickly after' the *Terry*

stop occurred"; Judge Winston "addressed the prosecutor's assertion that [appellee's] illegal detention was short"; and "the court ruled that appellee's confession 'was still causally connected to the illegality because the defendant would surely have left the scene had he not been unlawfully detained.' "

■ In terms of the attenuation doctrine, the issue is "whether 'the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint.' " *United States v. Ceccolini,* 435 U.S. 268, 273–74, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (quoting *Wong Sun, supra,* 371 U.S. at 487, 491, 83 S.Ct. 407). The Supreme Court further explained the doctrine by quoting Justice Felix Frankfurter's opinion in *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939):

> [T]he facts improperly obtained do not "become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it" simply because it is used derivatively.
>
> In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint.

*Ceccolini, supra,* 435 U.S. at 275–76, 98 S.Ct. 1054 (other citation omitted) (internal quotation marks omitted).

Our review of the record shows that the government did not explicitly raise the attenuation issue in the trial court. Its "motion in opposition to defendant's motion to

suppress ... statements" does not mention the attenuation doctrine, nor does it cite *Wong Sun, supra,* or *Brown, supra,* cases which discuss that doctrine. It is true, however, as the government argues, that Mr. McMillian's "motion to suppress tangible evidence, identification testimony, and statements" stated that: "Because the police officers did not have reasonable suspicion, let alone probable cause, to seize Mr. McMillian initially, any evidence recovered following the seizure must be suppressed as a fruit of the illegality," and that "the statements allegedly elicited after Mr. McMillian's arrest are also tainted fruit of the Fourth Amendment violations." [8] In making these arguments, Mr. McMillian cited both *Wong Sun* and *Brown.* The government relies on statements in the trial court made by the prosecutor and the judge, which have been "concede[d]" by Mr. McMillian, in its contention that the attenuation issue has been preserved. In addition, as the government points out, Judge Winston ruled that Mr. McMillian's confession "was still causally connected to the illegality because the defendant would surely have left the scene had he not been unlawfully detained." Under these circumstances, we are satisfied that the issue has been preserved, and that it can be decided under existing legal principles.

■ In *Brown,* rather than remanding the case for resolution of the attenuation issue, the Supreme Court resolved it, even though the Illinois courts had not examined the issue under *Wong Sun,* because the "the trial resulted in a record of amply sufficient detail and depth from which the determination may be made." 422 U.S. at 604, 95 S.Ct. 2254. The court concluded "that the State failed to sustain the burden of showing that the evidence in question

was admissible under *Wong Sun.*" *Id.* at 604–05, 95 S.Ct. 2254. We believe that the record of the suppression hearing, which contains the testimony of law enforcement officers who played a role in Mr. McMillian's arrest and interrogation is sufficiently detailed to determine, under established legal principles, whether the taint of Mr. McMillian's illegal seizure was purged before his confession was made.

■ To benefit from the attenuation doctrine, the government must show that Mr. McMillian's confession resulted from "an independent source," *Ceccolini, supra,* 435 U.S. at 274, 98 S.Ct. 1054 (citing *Nardone, supra,* 308 U.S. at 341, 60 S.Ct. 266), or was arrived at "by means sufficiently distinguishable to be purged of the primary taint," *Brown,* 422 U.S. at 599, 95 S.Ct. 2254 (citations omitted), rather than "by exploitation of [the] illegality." *Id.* See also *Oliver v. United States,* 656 A.2d 1159, 1172 (D.C.1995) ("The government bears the burden of proving that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of the illegality.") (citation and internal quotation marks omitted). The trial judge's reason for finding no attenuation, *i.e.,* that Mr. McMillian would have left the scene and not been immediately available for arrest had he not been unlawfully detained, is "tantamount to adopting the 'but for' rule rejected by the Supreme Court in *Wong Sun.*" *State v. Phillips,* 140 Vt. 210, 436 A.2d 746, 751 (1981). See also *Ceccolini,* 435 U.S. at 274, 98 S.Ct. 1054; *United States v. Kennedy,* 457 F.2d 63, 66 (10th Cir.1972).

■ With respect to the showing required under the attenuation doctrine, it is insufficient to establish only that Mr. McMillian was given the warnings re-

---

8. In the Lesane murder case, Judge Bowers had ruled that "any statements [Mr. McMilli-an] made are suppressed, under *Brown v. Illinois* and *Wong Sun.*"

quired by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See also Keeter v. United States,* 635 A.2d 903, 908 (D.C.1993) ("The advice and waiver of *Miranda* rights could not alone suffice.") (citing *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). As the Supreme Court said in *Brown v. Illinois:*

> [E]ven if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S. at 486, 83 S.Ct. 407. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.
>
> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.

*Brown, supra,* 422 U.S. at 601–03, 95 S.Ct. 2254 (other citation omitted). Factors other than *Miranda* warnings include: "The temporal proximity of the [illegal] arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct . . . ." *Oliver, supra,* 656 A.2d at 1172 (quoting *Brown, supra,* 422 U.S. at 603–04, 95 S.Ct. 2254). "The relative importance of each of these factors in any particular case of course depends on the circumstances of that case." *Id.* (quoting *United States v. Cherry,* 759 F.2d 1196,

1211 (5th Cir.1985)). *See also Taylor v. Alabama,* 457 U.S. 687, 699, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) ("Critical to the Court's holding was its observation that the petitioner 'confessed without any intervening event of significance.' ") (quoting *Dunaway, supra,* 442 U.S. at 219, 99 S.Ct. 2248).

Under the temporal proximity attenuation factor, hours elapsed between the seizing of Mr. McMillian around 2:34 p.m. and the beginning of his confession some time after 7:35 p.m. As to the flagrancy of official misconduct factor, while Mr. McMillian's seizure was illegal, we cannot say on this record that it was particularly flagrant, surprising, frightening or confusing, *see Brown,* 422 U.S. at 605, 95 S.Ct. 2254, in the manner in which it occurred. At most, Sergeant Dodgson's following of Mr. McMillian to the bank at 6th Street, his request that Mr. McMillian return to the bus, his walk side by side with Mr. McMillian back to the bus, and his instructions to Officers Pond and Paradis to stay with him were intrusive but not flagrant. Also important, however, is the factor of an "intervening event of significance," *Taylor, supra,* 457 U.S. at 699, 102 S.Ct. 2664.

Mr. McMillian maintains that no intervening event of significance from an independent source occurred in this case. As examples of such an event he cites *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), where the defendant had been presented to a magistrate and advised of his rights before his confession, and *Wilkerson v. United States,* 432 A.2d 730 (D.C.1981), where the defendant voluntarily went to the police station eight days after the police illegally seized stolen property from him. The government argues, however, that probable cause here from an independent source which materialized moments after Mr.

McMillian was seized, provided the intervening event of significance. In making this argument, the government relies on two of our cases, *Oliver, supra,* and *Al–Mahdi v. United States,* 867 A.2d 1011 (D.C.2005). *Oliver* involved the entry of the police into a home, without a warrant, to retrieve a baby kidnapped from D.C. General Hospital. The appellant was illegally seized and subsequently confessed. We determined that the intervening event of significance there which purged the taint of the illegal seizure was the positive identification of the kidnapped baby by personnel at the D.C. General Hospital. *Id.* at 1172. In *Al–Mahdi, supra,* the government conceded that the police did not have probable cause when they arrested appellant in connection with the fatal shooting of his mother's boyfriend. Unlike this case, we specifically stated that "[t]his lack of probable cause did not render [the officer's] action improper, for he unquestionably did have sufficient reasonable grounds to detain appellant temporarily until a preliminary investigation either generated probable cause or resulted in [appellant's] release." 867 A.2d at 1022–23 (citations and internal quotation marks omitted). Nevertheless, the intervening event of significance in *Al–Mahdi* was the generation of probable cause. The independent source for the probable cause was appellant's mother who saw her son fire the fatal shots. *Id.* at 1023. Probable cause in this case was established through Sergeant Smith of the MPD, who found the gun, moments after Mr. McMillian's illegal stop, under the bus seat that appellant had occupied. Sergeant Smith of course was not the Capitol Police officer who illegally seized Mr. McMillian. Acting independently, Sergeant Smith spoke with the bus driver and learned that the man whom the Capitol Police had secured outside the bus "was moving around and up to something in the back of the bus and had in fact changed his clothes in the rear of the bus and left his shirt back there." At the bus driver's direction, Sergeant Smith proceeded to the rear of the bus, saw "a dark blue shirt on the seat," looked under the shirt and then "under the seat [where he] observed a semiautomatic pistol." It was Sergeant Smith of the MPD who informed Sergeant Dodgson of the Capitol Police that a gun was found in the rear of the bus. Sergeant Smith's discovery of the gun represented the intervening event of significance from an independent source that *Ceccolini* and *Brown v. Illinois* require. In short, the discovery of the gun resulted in probable cause which purged the taint, but probable cause was not generated "by exploitation of [the] illegality" of Mr. McMillian's detention by the Capitol Police. *Brown, supra,* 422 U.S. at 599, 95 S.Ct. 2254. Put another way, the connection between the illegal seizure and Mr. McMillian's confession had "become so attenuated as to dissipate the taint." *Ceccolini, supra,* 435 U.S. at 273–74, 98 S.Ct. 1054.[9]

Accordingly, for the foregoing reasons, we affirm the trial court's ruling on the collateral estoppel and the illegal stop issues, resolve the attenuation issue in favor of the government, and remand the case to the trial court for further proceedings.

*So ordered.*

9. Our resolution of the attenuation issue still leaves open, however, the Fifth Amendment *Miranda* issue which the trial court will have to resolve on remand.